# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Ivy Hill Congregation of | : | |
| Jehovah's Witnesses, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 316 M.D. 2020 |
| | : | Argued: March 17, 2021 |
| Commonwealth of Pennsylvania, | : | |
| Department of Human Services, | : | |
| Respondent | : | |

BEFORE:  HONORABLE P. KEVIN BROBSON, President Judge
HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE ELLEN CEISLER, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY PRESIDENT JUDGE BROBSON**     **FILED: June 17, 2021**

In this original jurisdiction matter, Ivy Hill Congregation of Jehovah's Witnesses (Petitioner or Congregation) has filed a "Petition for Review in the Nature of a Complaint for Declaratory Relief" (Petition) against the Commonwealth of Pennsylvania, Department of Human Services (DHS). Therein, Petitioner seeks a declaration concerning the meaning and, alternatively, the validity of the so-called clergyman privilege preserved in Section 6311.1(b)(1) of the Child Protective Services Law (CPSL), 23 Pa. C.S. § 6311.1(b)(1), and set forth in Section 5943 of the Judicial Code, 42 Pa. C.S. § 5943, as applied to its elders. Currently before the

Court are the preliminary objections filed by DHS and Petitioner's application for summary relief. For the reasons that follow, we overrule DHS's preliminary objections and deny Petitioner's application for summary relief.

## I.   BACKGROUND

### A. Statutory Framework at Issue

Prior to outlining the factual background underlying this matter, and to aid in the understanding of the issues presented to the Court, we provide the following discussion of the relevant statutes. The CPSL[1] was enacted, in part, "to encourage more complete reporting of suspected child abuse." 23 Pa. C.S. § 6302(b). In furtherance of that purpose, the CPSL identifies certain adults as "mandated reporters" and generally requires them to "make a report of suspected child abuse[] . . . if the person has reasonable cause to suspect that a child is a victim of child abuse." *Id.* § 6311(a). Most pertinent to this matter, a mandated reporter includes "[a] clergyman, priest, rabbi, minister, Christian Science practitioner, religious healer or spiritual leader of any regularly established church or other religious organization." *Id.* § 6311(a)(6).

A mandated reporter is obligated to make an oral or written report of suspected child abuse "immediately." *Id.* § 6313(a)(1). In this respect, the CPSL more specifically provides:

(a) Report by mandated reporter.--

(1) A mandated reporter shall immediately make an oral report of suspected child abuse to [DHS] via the Statewide toll-free telephone number under section 6332 (relating to establishment of Statewide toll-free telephone number) or a written report using electronic technologies under section 6305 (relating to electronic reporting).

---

[1] 23 Pa. C.S. §§ 6301-6387.

2

(2) A mandated reporter making an oral report under paragraph (1) of suspected child abuse shall also make a written report, which may be submitted electronically, within 48 hours to [DHS] or county agency assigned to the case in a manner and format prescribed by [DHS].

23 Pa. C.S. § 6313(a)(1)-(2).[2]

Further, Section 6319 of the CPSL, 23 Pa. C.S. § 6319, sets forth the penalties for failing to make a required report. Generally, "[a] person or official required . . . to report a case of suspected child abuse or to make a referral to the appropriate authorities commits an offense if the person or official willfully fails to do so." *Id.* § 6319(a)(1). The grading of the offense ranges from a second-degree misdemeanor to a second-degree felony, depending on the circumstances. *Id.* § 6319(a)(2)-(3), (b), (c).

In requiring mandated reporters to report suspected child abuse immediately and exposing them to criminal penalties for noncompliance, the CPSL also provides as follows, in relevant part, with respect to privileged communications:

(a) General rule.--Subject to subsection (b), the privileged communications between a mandated reporter and a patient or client of the mandated reporter shall not:

(1) Apply to a situation involving child abuse.

(2) Relieve the mandated reporter of the duty to make a report of suspected child abuse.

(b) Confidential communications.--The following protections shall apply:

---

[2] DHS is tasked with overseeing the administration and implementation of the CPSL. *See, e.g.*, Subchapter C of the CPSL, 23 Pa. C.S. §§ 6331-6349 (outlining powers and duties of DHS); *id.* §§ 6306, 6348 (tasking DHS with responsibility to promulgate regulations implementing provisions of CPSL).

> (1) Confidential communications made to a member of the clergy are protected under 42 Pa.[]C.S. § 5943 (relating to confidential communications to clergymen).

23 Pa. C.S. § 6311.1(a)-(b)(1).  Section 5943 of the Judicial Code in turn provides:

> No clergyman, priest, rabbi or minister of the gospel of any regularly established church or religious organization, except clergymen or ministers, who are self-ordained or who are members of religious organizations in which members other than the leader thereof are deemed clergymen or ministers, who while in the course of his duties has acquired information from any person secretly and in confidence shall be compelled, or allowed without consent of such person, to disclose that information in any legal proceeding, trial or investigation before any government unit.

42 Pa. C.S. § 5943.  As further discussed herein, it is the interplay between the CPSL's mandatory reporting provisions and the protections afforded by the clergyman privilege as preserved therein that are at issue in this matter.

## B. Jehovah's Witnesses and the Role of Elders

According to the Petition, "Jehovah's Witnesses are a regularly[ ]established Christian church . . . with over 8.6 million worshippers spread among over 119,000 congregations around the world." (Petition ¶ 9.)  Petitioner is one such congregation "located in Philadelphia, Pennsylvania, consisting of approximately 130 congregants who meet regularly and worship in accordance with the beliefs and practices of Jehovah's Witnesses."[3]  (*Id.* ¶¶ 6, 9.)  Petitioner does not use paid, full-time clergy; instead, it is aided in the worship of God by volunteers

___

[3] Petitioner also avers that "all Jehovah's Witnesses share a common set of religious beliefs rooted in Scripture and the Congregation regularly gathers to worship in accordance with the dictates and traditions of their faith."  (Petition ¶ 61.)  Petitioner further avers that "Jehovah's Witnesses also have a recognized creed and form of worship, a definite and distinct ecclesiastical government, a formal code of doctrine and discipline, a distinct religious history, specific literature published and promulgated on a regular basis, and hold regular services."  (*Id.* ¶ 62.)  While Jehovah's Witnesses do not call their physical place of worship a "church," they gather to worship at buildings known as Kingdom Halls, including Petitioner's Kingdom Hall.  (*Id.* ¶¶ 63-64.)

4

identified as "spiritually mature men collectively referred to as the 'body of elders,' who take the spiritual lead in the Congregation." (*Id.* ¶¶ 10-11, 13.) There are currently seven elders on the body of elders in the Congregation. (*Id.* ¶ 12.)

"The elders are ordained ministers tasked with overseeing the spiritual needs of the Congregation in accordance with the Bible, secular laws, and the beliefs and practices of the Jehovah's Witnesses." (*Id.* ¶ 14.) Any male congregant who satisfies certain Scriptural qualifications found in the Bible is eligible for appointment as an elder. (*Id.* ¶ 15.) Upon satisfaction of the Scriptural qualifications, a congregant may be recommended for appointment by the Congregation's existing body of elders, which recommendation is then transmitted to a "circuit overseer," an experienced traveling elder who oversees multiple congregations in a geographic area. (*Id.* ¶¶ 16-17.) If satisfied that the recommended congregant meets the necessary Scriptural qualifications, the circuit overseer may appoint the congregant as an elder. (*Id.* ¶ 18.)

All of Petitioner's elders receive continual ecclesiastical training designed to help them "more effectively carry out various aspects of their ecclesiastical responsibilities." (*Id.* ¶ 19.) These responsibilities include, *inter alia*, hearing confessions and providing spiritual guidance and counseling. (*Id.* ¶¶ 20-21.) In this regard, "all congregants are encouraged to seek spiritual counsel and assistance from the elders if they commit a serious transgression of God's laws," because "Jehovah's Witnesses believe that a congregant who commits a serious sin requires spiritual counsel and assistance in order to maintain his or her relationship with God." (*Id.* ¶ 22.) Congregants who have committed a serious sin disclose private and highly sensitive information to elders, which "allows the elders to provide the sinner with specific spiritual counsel and assistance and to make personalized petitions to

5

God in prayer on [his/her] behalf." (*Id.* ¶ 23.) Notably, only elders are authorized to hear and address confessions of serious sin, and a congregant who commits a serious sin must confess to and receive guidance from at least three elders. (*Id.* ¶¶ 27-28.)

Jehovah's Witnesses emphasize Biblical principles of privacy and confidentiality, as open communication between congregants and elders is essential to providing effective spiritual guidance. (*Id.* ¶ 24.) Accordingly, when one of Petitioner's congregants confesses a sin or requests spiritual guidance, the communication with the elder is strictly confidential. (*Id.* ¶ 25.) Additionally, because "repentance and reconciliation with God is crucial to eternal salvation, the ability to confidentially divulge serious sin to elders is an important part of the congregants' faith and worship." (*Id.* ¶ 26.) Thus, notwithstanding the involvement of multiple elders in confessions of serious sin, "the principles of privacy and confidentiality apply with equal force." (*Id.* ¶ 27.)

"The elders' obligation to maintain confidentiality is based on Scripture and has . . . been explained in the official publications of Jehovah's Witnesses." (*Id.* ¶ 29.) Congregants rely on this Scriptural promise of confidentiality in confessing serious sins as they seek spiritual healing. (*Id.* ¶ 30.) If an elder in the Congregation disclosed confidential communications without a Scriptural basis, it could result in his removal as an elder, as well as harm to his relationship with God and to the credibility he and the other elders have with the Congregation. (*Id.* ¶¶ 31-32.)

### C. The Present Action

Petitioner alleges that its elders receive information regarding serious sins, including possible abuse of minors, which would implicate the mandatory reporting requirements of the CPSL but for application of the clergyman privilege. (Petition

6

¶ 44.) Petitioner asserts that, while these communications are "premised on the understanding and the sincerely held belief by all parties involved that the communications will remain confidential," it is unclear whether the elders fall within the class of individuals covered by the clergyman privilege such that it would apply to those communications.[4] (*Id.* ¶¶ 45-46.) Petitioner avers that this legal ambiguity has and will continue to impact negatively the Congregation's ability to practice the Jehovah's Witnesses faith. (*Id.* ¶ 48.) Petitioner adds that this uncertainty creates tension between the practice of the Jehovah's Witnesses faith and Petitioner's obligations under the CPSL, which is compounded by the immediacy with which an elder must act in deciding whether to make a report of suspected child abuse and an elder's potential criminal exposure for failing to make a report. (*Id.* ¶¶ 49-53.)

Based on the foregoing, Petitioner filed the instant Petition against DHS asserting two counts. In Count I, Petitioner requests a declaration that its elders are entitled to the protections set forth in Section 6311.1(b)(1) of the CPSL and Section 5943 of the Judicial Code because they are "ministers of the gospel of a regularly established church" that "are neither 'self-ordained' nor 'members of religious organizations in which members other than the leader thereof are deemed

---

[4] Petitioner claims that its concern regarding the lack of clarity in the law described above stems from a recent criminal complaint filed in Lancaster County against a Bishop in the Amish faith, alleging that his failure to report a confession of child abuse by a member of the Amish community constituted a violation of Section 6319 of the CPSL. (Petition ¶ 47.) Also, to further demonstrate the lack of clarity, Petitioner attaches two letters exchanged in 1998 between The Watchtower Bible and Tract Society of New York, Inc. (Society), "which serves the interests of Jehovah's Witnesses throughout the United States," and the Pennsylvania Office of Attorney General (OAG). (Petition, Exhibit A, Letters dated 3/26/1998 and 4/6/1998.) In the letters, the Society sought clarification from the OAG regarding child abuse reporting obligations "[i]n the interest of assisting ministers of Jehovah's Witnesses to comply with local child abuse reporting laws," but the OAG responded that it was prohibited by law from giving an opinion to the Society and recommended that the Society refer its questions to private counsel. (*Id.*)

clergymen or ministers.'" (Petition at 20.) In Count II, which Petitioner pleads in the alternative, Petitioner requests that, to the extent that the clergyman privilege is determined to exclude its elders on the basis that they are "members of [a] religious organization[] in which members other than the leader thereof are deemed clergymen or ministers," the Court declare the statute to be unconstitutional and sever that portion from the remainder. (*Id.* at 24-25.)

As noted, Petitioner has also filed an application for summary relief, and DHS has filed preliminary objections to the Petition. In its preliminary objections, DHS argues that: (1) the Petition should be dismissed because Petitioner lacks standing; (2) the Petition should be dismissed because Petitioner failed to join indispensable parties; (3) Count I of the Petition should be dismissed because Petitioner failed to exhaust administrative remedies; (4) Count I should be dismissed because the requested relief would not terminate the alleged uncertainty regarding future enforcement actions; and (5) Count II should be dismissed because it lacks merit.

## II.   DISCUSSION

### A. Preliminary Objections[5]

#### 1.  Standing

DHS first argues that Petitioner lacks standing to bring this action because it has failed to allege that it has been aggrieved or that there is an actual controversy

---

[5] We are mindful of the following well-settled principles that govern our disposition of DHS's preliminary objections:

> [T]his Court accepts as true all well-pleaded allegations of material fact and all inferences reasonably deducible from those facts. However, we need not accept unwarranted inferences, conclusions of law, argumentative allegations, or expressions of opinion. For this Court to sustain preliminary objections, it must appear with certainty that the law will permit no recovery. We resolve any doubt in favor of the non-moving party.

between the parties. DHS specifically claims that the Petition fails to include any allegation that DHS has an actual or threatened enforcement action against Petitioner and that the mere possibility that one of Petitioner's elders may become a target of an enforcement action in the future is insufficient to confer standing upon Petitioner. DHS adds that, to have standing, Petitioner is required to plead that an identifiable member is suffering an immediate or threatened injury by DHS as a result of the interplay between the CPSL's reporting provisions and the clergyman privilege.[6] In response, Petitioner argues that this case constitutes a pre-enforcement challenge brought under the Declaratory Judgments Act (Act),[7] and, as such, Petitioner has standing to pursue the claims raised under the principles set forth in *Firearm Owners Against Crime v. City of Harrisburg (FOAC)*, 218 A.3d 497 (Pa. Cmwlth. 2019) (*en banc*), *appeal granted in part*, 230 A.3d 1012 (Pa. 2020), and *Robinson Township, Washington County v. Commonwealth*, 83 A.3d 901 (Pa. 2013).

"Under Pennsylvania law, an association has standing as representative of its members to bring a cause of action even in the absence of injury to itself, if the association alleges that at least one of its members is suffering immediate or threatened injury as a result of the action challenged." *Robinson Twp.*, 83 A.3d

---

*Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1214 n.6 (Pa. Cmwlth. 2018) (*en banc*) (citations omitted).

[6] DHS adds that any attempt by Petitioner to seek relief on behalf of all Jehovah's Witnesses is inappropriate, as there are no factual allegations that all congregations practice and follow the beliefs of Jehovah's Witnesses similarly to permit one congregation to seek relief on behalf of all. We disagree with DHS's characterization. With regard to Count I, Petitioner seeks clarification as to whether the clergyman privilege preserved in Section 6311.1(b)(1) of the CPSL applies to *its* elders. As to Count II, Petitioner requests the Court to declare Section 5943 of the Judicial Code facially unconstitutional, or unconstitutional as applied to Jehovah's Witnesses, and DHS has not convinced the Court that Jehovah's Witnesses congregations practice and follow their beliefs in such dissimilar manners as to preclude relief on this basis at this stage of the matter.

[7] 42 Pa. C.S. §§ 7531-7541.

9

at 922. "An association seeking standing is not required to disclose the identity of its affected member, but it must describe the affected member in sufficient detail to show that the member is aggrieved." *FOAC*, 218 A.3d at 511. A party is aggrieved when the party has "a substantial, direct, and immediate interest in the outcome of the litigation." *Id.* at 506.

> A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law. A direct interest requires a causal connection between the asserted violation and the harm complained of. An interest is immediate when the causal connection is not remote or speculative.

*Id.* (quoting *Phantom Fireworks*, 198 A.3d at 1215).

In addition to these principles, "[o]ur existing jurisprudence permits pre-enforcement review of statutory provisions in cases in which petitioners must choose between equally unappealing options and where the third option . . . is equally undesirable." *Robinson Twp.*, 83 A.3d at 924. For instance, in *Robinson Township*, the Supreme Court was tasked with determining whether a physician had standing to challenge a statute restricting his ability to obtain and share information with other physicians regarding chemicals used in drilling operations. The physician claimed that the restrictions improperly impeded his ability to care for his patients. *Id.* at 923. He further claimed that the restrictions forced medical professionals to choose between complying with the statute's mandatory provisions "and adhering to their ethical and legal duties to report findings in medical records and to make th[o]se records available to patients and other medical professionals." *Id.* at 923-24. This Court held that the physician would not have standing until (1) he actually requested the information restricted by the statute and that information was not supplied or supplied with restrictions interfering with his ability to provide proper medical care,

10

or (2) the physician actually received the information and wished to share it. *Id.* at 923.

On appeal, however, the Supreme Court noted that the statute placed the physician in the "untenable and objectionable position [of] choosing between violating [a statutory confidentiality agreement] and violating his legal and ethical obligations to treat a patient by accepted standards, or not taking a case and refusing a patient medical care." *Id.* at 924. The Supreme Court explained that, given the physician's "unpalatable professional choices in the wake of [the statute at issue]," the interest he asserted was substantial and direct. *Id.* The Supreme Court added that the physician's interest was "not remote":

> A decision in this matter may well affect whether [the physician], and other medical professionals similarly situated, will accept patients and may affect subsequent medical decisions in treating patients—events which may occur well before the doctor is in a position to request information regarding the chemical composition of fracking fluid from a particular Marcellus Shale industrial operation. Additional factual development that would result from awaiting an actual request for information on behalf of a patient is not likely to shed more light upon the constitutional question of law presented by what is essentially a facial challenge to [the statute at issue].

*Id.* at 924-25. The Supreme Court thus concluded that the physician's interest in the outcome of the litigation regarding the constitutionality of the statute was sufficient to confer standing upon him.

Following *Robinson Township*, this Court in *FOAC* considered an appeal relating to an action filed in the Court of Common Pleas of Dauphin County, wherein certain individual gun owners and a political action committee (collectively, FOAC) sought to challenge the validity of five ordinances of the City of Harrisburg (City). The ordinances generally regulated in some way the "use, possession, ownership, and/or transfer of firearms within the City," and they exposed violators to potential

11

criminal liability. *FOAC*, 218 A.3d at 502-03. Most relevant to this appeal, one of the ordinances required "firearms owners to report lost or stolen firearms to law enforcement within 48 hours after discovery of the loss or theft (Lost/Stolen Ordinance)." *Id.* at 502.

In *FOAC*, the City challenged FOAC's standing to contest the validity of the ordinances, arguing, in part, that none of the individual plaintiffs had violated the ordinances, been cited or threatened with citation under any of them, or been prosecuted for a violation. The trial court sustained the City's preliminary objection based on standing and dismissed the action. On appeal, this Court concluded that FOAC had standing to challenge the Lost/Stolen Ordinance and all but one of the other ordinances.[8] On this point, the Court most relevantly relied on *Robinson Township*, among other cases, in explaining the "equally unappealing options" faced by the individual plaintiffs in *FOAC*: they can either "curb their conduct to conform to the ordinances' mandates or they can willfully violate the law and face criminal prosecution." *FOAC*, 218 A.3d at 513. Noting that the individual plaintiffs had "no real alternative avenue to address their grievance," which concerned whether the ordinances were facially invalid restrictions on their constitutional rights, we explained that "[i]t makes little sense to wait for [the individual plaintiffs] to break the law, which we presume they do not want to do, before they can challenge it. It

---

[8] The Court concluded that FOAC did lack standing to challenge one of the ordinances prohibiting "the sale or transfer of firearms and ammunition during the period of emergency declaration by the Mayor [of Harrisburg] and further authoriz[ing] the Mayor to prohibit the public possession of firearms during such a state of emergency (State of Emergency Ordinance)." *FOAC*, 218 A.3d at 502-03. The Court rendered its conclusion based upon, *inter alia*, the fact that the State of Emergency Ordinance did "not currently impose any duty on the [i]ndividual [p]laintiffs or any restriction on their ability to use or possess firearms within the City," and that "[i]ts operative provisions only bec[a]me effective if/when the Mayor declares a state of emergency," which was limited to an extreme circumstance. *Id.* at 509.

also makes little sense to force law-abiding citizens to rely on law breakers to advocate their interests." *Id.* The Court further noted that, like the Supreme Court observed in *Robinson Township*, awaiting an actual criminal enforcement proceeding was unlikely to result in additional factual development that would be helpful to determining the question of law presented. *Id.*

In concluding that FOAC's interest was also "not remote," the *FOAC* Court added:

> A decision in this matter will affect the extent to which [the individual plaintiffs] may possess and use firearms within th[e] City, as well as whether they have any obligation to comply with a 48-hour reporting requirement. A decision in this case will afford [the parties] "relief from uncertainty and insecurity with respect to rights . . . and other legal relations," a core and remedial purpose behind the . . . Act.

*Id.* at 514 (quoting 42 Pa. C.S. § 7541(a)). Thus, the Court found that pre-enforcement review of four of the ordinances was appropriate and that FOAC had standing to bring the challenges asserted. *Id.*

Turning to the circumstances of this matter, we conclude that Petitioner's elders' interest in the outcome of this litigation is sufficiently substantial, direct, and immediate to confer standing upon Petitioner as their representative under *Robinson Township* and *FOAC*. At bottom, this case concerns the elders' current reporting obligations under the CPSL and the impact the clergyman privilege, as preserved in that statute, has on the scope of those reporting obligations. The uncertainty regarding the meaning and, alternatively, the validity of the clergyman privilege as preserved in the CPSL with respect to its coverage of the elders, which serves as the basis for this litigation, leaves Petitioner's elders with the following "equally unappealing options": (1) report suspected child abuse they learn of during the course of a confidential communication in violation of their religious beliefs; (2) refuse to report suspected child abuse they learn of during the course of a

13

confidential communication and risk criminal prosecution for a failure to report; or (3) abstain from fully performing their ecclesiastical responsibilities as they relate to hearing confessions and providing spiritual guidance and counseling. We find these to be "unpalatable . . . choices" akin to those faced by the physician in *Robinson Township* and the individual plaintiffs in *FOAC* which, in turn, rendered their asserted interests "substantial and direct." *Robinson Twp.*, 83 A.3d at 924.

Further, we likewise conclude that Petitioner's elders' interest is not remote. A decision in this case may affect how the elders perform their ecclesiastical functions, such as hearing confessions and providing spiritual guidance and counseling, and it will impact their reporting obligations under the CPSL. We also conclude that any additional factual development that would result from awaiting an actual criminal enforcement proceeding is not likely to shed more light on the issues raised herein. Finally, "[a] decision in this case will afford [the parties] 'relief from uncertainty and insecurity with respect to rights . . . and other legal relations,' a core and remedial purpose behind the . . . Act." *FOAC*, 218 A.3d at 514 (quoting 42 Pa. C.S. § 7541(a)). Thus, we conclude that this case presents an instance where pre-enforcement review is proper, and we overrule DHS's preliminary objection asserting lack of standing.

## 2. Nonjoinder of Indispensable Parties

DHS argues that, while Petitioner seeks a declaration that its elders are entitled to assert the clergyman privilege, that privilege would be asserted during a law enforcement investigation or subsequent criminal enforcement action. DHS notes that the CPSL defines "law enforcement official" to include "[t]he Attorney General[; a] Pennsylvania district attorney[; a] Pennsylvania State Police officer[; and a] municipal police officer." 23 Pa. C.S. § 6303. DHS contends that these law

enforcement officials are distinct from DHS, which only handles administrative matters, and that the law enforcement officials (not DHS) are responsible for investigating and prosecuting the criminal offenses arising out of the CPSL, including instances of failing to report. Thus, according to DHS, these entities have an interest in whether an enforcement action can proceed in light of the privilege that would be affected by any declaration rendered herein, and the Petition should be dismissed based on Petitioner's failure to join any of them as indispensable parties to this action.

Petitioner counters that this is a pre-enforcement challenge brought under the Act in which it seeks only a declaration concerning whether Petitioner's elders are required to speak specifically to DHS under the CPSL. Petitioner argues that the other parties identified by DHS are not entities to whom there is a mandatory obligation to report suspected child abuse under the CPSL. Petitioner thus asserts that DHS is the only indispensable party to this action and that the other parties identified by DHS do not have a sufficient interest in this litigation to require their joinder. Petitioner adds that any interest those parties have either is adequately represented by DHS, particularly with respect to the OAG because it is representing DHS in this litigation, or is otherwise "indirect or incidental." *City of Philadelphia v. Commonwealth*, 838 A.2d 566, 582 (Pa. 2003). Petitioner also contends that, taking DHS's argument to its logical end, Petitioner would have to join thousands of "law enforcement officials" as necessary parties, which would be absurd.

Generally, "[a] party is indispensable when its rights are so connected with the claims of the litigants that no relief can be granted without infringing on those rights." *Phantom Fireworks*, 198 A.3d at 1214. In determining whether a party is indispensable, we must inquire into "whether justice can be done in the absence of"

15

that party, taking into consideration "the nature of the claim and the relief sought." *City of Philadelphia*, 838 A.2d at 581 (quoting *CRY, Inc. v. Mill Serv., Inc.*, 640 A.2d 372, 375 (Pa. 1994)). Further, Section 7540(a) of the Act, 42 Pa. C.S. § 7540(a), dictates that, "[w]hen declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." This provision, however, is "subject to limiting principles," including that joinder may not be required "where the interest involved is indirect or incidental." *City of Philadelphia*, 838 A.2d at 582.

This matter concerns Petitioner's elders' initial reporting obligations to DHS under the CPSL and whether the protections afforded by the clergyman privilege—preserved in Section 6311.1(b)(1) of the CPSL through incorporation of Section 5943 of the Judicial Code—relieves them of those obligations should the requirements for invocation of the privilege otherwise be met. To the extent this matter implicates a law enforcement interest in whether the privilege can be invoked in a particular future enforcement action that is held by the parties DHS identifies, we conclude that interest is "indirect and incidental" to the claims and relief sought by Petitioner relating to its elders' initial reporting obligations herein. In other words, we do not believe that the law enforcement officials identified have rights "so connected with the claims of the litigants that no relief can be granted without infringing on those rights," nor do we believe that justice cannot be done in the absence of those parties. *City of Philadelphia*, 838 A.2d at 581. To be clear, this case is not about the role of the prosecutor in charging a particular mandated reporter; rather, it is about whether the privilege preserved in the CPSL is available to Petitioner's elders such that there may be occasions where they are not required

to report instances of child abuse to DHS. Ultimately, courts, not prosecutors, decide whether a privilege attaches. We, therefore, overrule DHS's preliminary objection.

3. Failure to Exhaust Administrative Remedies as to Count I

DHS next argues that Petitioner has never sought an interpretation of the CPSL from DHS or requested it to give meaning to the two statutory schemes at issue. DHS contends that Petitioner "could have reached out" to DHS to determine whether its elders are mandated reporters and whether DHS has promulgated regulations concerning their reporting requirements. (DHS's Brief at 18.) DHS further submits that, at this point in the litigation, it is Petitioner's burden to show that the administrative process before DHS is unavailable or inadequate, or that it will suffer any harm awaiting DHS to respond to a request. Thus, DHS seeks dismissal of Count I of the Petition on the basis that Petitioner has failed to exhaust its administrative remedies.

In response, Petitioner argues that no administrative remedies exist, as evidenced by DHS's failure to identify any such remedy in support of its claim. Petitioner emphasizes that, while DHS seems to imply that the remedy available is a general ability to request guidance from DHS, it does not point to any statutory or regulatory vehicle by which to advance that request, nor does DHS say that it is obligated to respond. Petitioner contends that, to the contrary, there is no statute or regulation permitting it to seek binding guidance from DHS.

As this Court has previously explained:

> The doctrine requiring exhaustion of administrative remedies preserves the integrity of the administrative process by requiring the administrative agency charged with broad regulatory and remedial powers to address issues within its expertise before judicial review attaches. *LeGrande v. Dep't of Corr.*, 894 A.2d 219 (Pa. Cmwlth. 2006). Thus, a court lacks power to act until all administrative remedies are exhausted. *Id.* In addition, "[t]he rule requiring

17

exhaustion of administrative remedies is not intended to set up a procedural obstacle to recovery; the rule should be applied only where the available administrative remedies are adequate with respect to the alleged injury sustained and the relief requested." *Ohio Cas.* [*Grp.*] *of Ins. Cos. v. Argonaut Ins. Co.*, . . . 525 A.2d 1195, 1198 ([Pa.] 1987).

*Unified Sportsmen of Pa. v. Pa. Game Comm'n (PGC)*, 950 A.2d 1120, 1135 (Pa. Cmwlth. 2008).

Here, while DHS argues that Petitioner did not exhaust its administrative remedies, DHS has failed to identify the particular remedy that Petitioner could utilize to pursue its claims. In *Unified Sportsmen*, the Court overruled a preliminary objection asserting failure to exhaust administrative remedies under similar circumstances. *See Unified Sportsmen*, 950 A.2d at 1135 (overruling PGC's preliminary objection asserting sportsmen's group's failure to exhaust available administrative remedies because, *inter alia*, PGC did not "identify a specific remedy [the sportsmen's group] may pursue to challenge [PGC's] deer management policies and practices"). Further, insofar as DHS suggests that Petitioner could have availed itself of some informal procedure to obtain the relief it seeks, we note:

> Under the doctrine of exhaustion[,] before a litigant can be denied access to the courts[,] there must be a forum available in which he or she can participate. Nebulous claims of informal procedures or implied administrative powers are unavailing since it is clear that without a concrete procedural remedy the litigant could in no way achieve a resolution of his claim except by the grace of the party against whom he is proceeding.

*Ohio Cas. Grp. of Ins. Cos.*, 525 A.2d at 1198. For these reasons, we overrule DHS's preliminary objection based on failure to exhaust administrative remedies.

### 4. Demurrer to Count I (Relief Requested Would Not Terminate Controversy) and Demurrer to Count II (Lack of Merit)

DHS argues that the applicability of the clergyman privilege does not turn solely on the status of the individual asserting it; rather, its applicability is

18

determined by a court on a case-by-case basis and requires additional consideration of the nature of the underlying communication at issue.[9] Thus, according to DHS, even if Petitioner obtained a declaration that its elders are entitled to invoke the privilege as they seek in Count I of the Petition, that relief would not terminate the alleged uncertainty regarding future enforcement actions. DHS further alleges that, because application of the privilege is not guaranteed to any member of the clergy in light of the case-specific analysis of particular communications that must occur, the constitutional claims in Count II of the Petition lack merit.

Petitioner counters that, while legal precedent has identified the conditions under which particular communications are deemed to be privileged, it is the uncertainty in the law regarding "who" is specifically entitled to *invoke* the clergyman privilege that has triggered the present controversy. Petitioner contends that, once that question is answered, Petitioner's elders will be able to guide their conduct with respect to specific communications in accordance with the law going forward, thereby eliminating uncertainty about future enforcement under the CPSL. Petitioner additionally emphasizes that it is not seeking a declaration that all communications its elders engage in are privileged. Rather, Petitioner seeks only a narrow declaration that its elders fall within the class of individuals entitled to invoke the clergyman privilege set forth in Section 5943 of the Judicial Code such that, if the conditions regarding a particular communication are otherwise met, the elders

_____

[9] In support of its position, DHS relies upon cases including, *inter alia*, *Commonwealth v. Stewart*, 690 A.2d 195, 200 (Pa. 1997) (observing that application of clergyman privilege "is not based solely on the clergy's status, but whether the communication was made in confidence in the context of a penitential or spiritual matter"), and *Commonwealth v. Patterson*, 572 A.2d 1258, 1265 (Pa. Super. 1990) (concluding that "our legislature did not intend a *per se* privilege for any communication to a clergyman based on his status" and proceeding to "look to the circumstances to determine whether appellant's statements were made in secrecy and confidence to a clergyman in the course of his duties"). (DHS's Brief at 21-22.)

would be relieved of their reporting obligations under Section 6311.1(b)(1) of the CPSL. Thus, Petitioner argues that DHS's final two preliminary objections are without merit.

As previously noted, the Act is "remedial" legislation intended "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." 42 Pa. C.S. § 7541(a). In accordance with that purpose, the Act "is to be liberally construed and administered." *Id.* Pursuant to the Act, "[a]ny person . . . whose rights, status, or other legal relations are affected by a statute[] . . . may have determined any question of construction or validity arising under the . . . statute[] . . . and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* § 7533. Nonetheless, Section 7537 of the Act provides: "The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding . . . ." *Id.* § 7537.

Here, there is a present controversy concerning whether Petitioner's elders fall within the group of individuals entitled to invoke the clergyman privilege under Section 5943 of the Judicial Code, such that the elders may avail themselves of the protections afforded under Section 6311.1(b)(1) of the CPSL. A declaration from this Court, on either the statutory construction grounds asserted in Count I of the Petition or the constitutional grounds asserted in Count II of the Petition, regarding whether Petitioner's elders are so entitled, would terminate that controversy. Additionally, this uncertainty concerning the elders' "rights" or "status" under the provisions at issue is the sole uncertainty "giving rise to the [instant] proceeding." 42 Pa. C.S. §§ 7533, 7537. In other words, we agree with Petitioner that this case pertains only to "who"—specifically, Petitioner's elders—may assert the privilege,

20

not "what" content may be protected. Thus, it is of no moment that application of the clergyman privilege is case-specific and dependent on the particular communication at issue, as those circumstances do not operate to foreclose an end to the present controversy, nor do they render Petitioner's constitutional claims with respect to that controversy meritless. We, therefore, overrule DHS's final two preliminary objections.

## B. Application for Summary Relief[10]

As noted, Petitioner has filed an application for summary relief in conjunction with its Petition. Therein, Petitioner asserts that the award of summary relief is appropriate in this case because it presents a pure question of law concerning whether Petitioner's elders are entitled to avail themselves of the clergyman privilege. Petitioner further claims that, to the extent that any issues of fact are implicated herein, they relate to the elders' ecclesiastic functions as set forth by the established doctrine of Jehovah's Witnesses faith. As such, Petitioner claims those facts are not the proper subject of dispute.[11] In response, DHS argues that the Court should deny summary relief because: (1) DHS disputes its investigative duties under the CPSL as represented in the Petition and, thus, Petitioner does not have a clear

---

[10] "At any time after the filing of a petition for review in an appellate or original jurisdiction matter, the court may on application enter judgment if the right of the applicant thereto is clear." Pa. R.A.P. 1532(b). While an application "may be granted before an answer is filed and before the court disposes of outstanding preliminary objections," summary relief is warranted only "where material issues of fact are not in dispute and it is clear that the applicant is entitled to judgment as a matter of law." *State St. Bank & Tr. Co. v. Treasury Dep't*, 712 A.2d 811, 813 n.5, 815 n.18 (Pa. Cmwlth. 1998).

[11] In support of its position in this regard, Petitioner relies upon case law addressing instances in which the role of civil courts is limited in cases that touch upon certain ecclesiastical matters. We, however, do not believe that we are required to decide this matter simply on the averments of Petitioner without the benefit of further pleadings and possible trial, if the circumstances warrant.

right to judgment against DHS; (2) there exists a genuine issue of material fact concerning the role of Petitioner's elders; and (3) providing a declaration that the elders are entitled to invoke the clergyman privilege would equate to adjudicating the validity of a defense to a potential future lawsuit, which is improper.[12]

As repeatedly stated herein, the central question in this case concerns whether Petitioner's elders can assert the clergyman privilege under Section 5943 of the Judicial Code as preserved in Section 6311.1(b)(1) of the CPSL. The answer to this question requires an inquiry into whether Petitioner's elders fall within the ambit of "clergym[e]n, priest[s], rabbi[s] or minister[s] of the gospel of any regularly established church or religious organization," and yet are not "clergymen or ministers, who are self-ordained or who are members of religious organizations in which members other than the leader thereof are deemed clergymen or ministers."

---

[12] DHS also argues that disposition of Petitioner's application for summary relief should be stayed pending resolution of DHS's preliminary objections; however, our disposition of those preliminary objections above renders DHS's argument moot—and, as noted, an application for summary relief can be granted prior to a ruling on preliminary objections in any event. Relying upon Pennsylvania Rule of Civil Procedure No. 235 and Pennsylvania Rule of Appellate Procedure 521, DHS further argues that disposition of Petitioner's application should be stayed until Petitioner provides notice to the OAG of Petitioner's constitutional challenge made in Count II of the Petition. In arguing to the contrary, Petitioner notes that the rules require notice to the OAG in cases where the Commonwealth is not already a party. *See* Pa. R.C.P. No. 235 (requiring notice to OAG when "the Commonwealth is not a party"); Pa. R.A.P. 521 (requiring notice to OAG when "the Commonwealth or any officer thereof, acting in his official capacity, is not a party"). Petitioner argues that notice to the OAG in accordance with the rules is not required here because the Commonwealth is a party through DHS, citing *Lee v. Bureau of State Lotteries*, 492 A.2d 451, 452 (Pa. Cmwlth. 1985) (*en banc*) (rejecting Bureau of State Lotteries' argument that petitioner failed to notify OAG of constitutional challenge pursuant to Rule 521(a) because Commonwealth was party to action through Bureau, "an integral part of the Commonwealth"), *appeal denied*, 538 A.2d 878 (Pa. 1988). Petitioner further submits that DHS's notice argument should be rejected because Petitioner electronically served the OAG with the Petition upon filing it with this Court, the OAG currently represents DHS in this matter, and the OAG waited until the close of briefing to raise the issue. Finding Petitioner's arguments persuasive, we reject DHS's contention based on lack of notice and conclude that no further notice to the OAG is required.

42 Pa. C.S. § 5943. There is no evidentiary record at this juncture concerning matters such as the doctrine and organization of Petitioner or Jehovah's Witnesses upon which to make such a determination. Contrary to Petitioner's position, a determination in this regard is not clear as a matter of law. We therefore deny Petitioner's application for summary relief on this basis.

## III.    CONCLUSION

For the reasons stated above, we overrule DHS's preliminary objections and deny Petitioner's application for summary relief.

_____
P. KEVIN BROBSON, President Judge

Judge Crompton did not participate in the decision of this case.

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Ivy Hill Congregation of : 
Jehovah's Witnesses, : 
     Petitioner : 
     : 
    v. :  No. 316 M.D. 2020
     : 
Commonwealth of Pennsylvania, : 
Department of Human Services, : 
     Respondent : 

# **O R D E R**


  AND NOW, this 17th day of June, 2021, the preliminary objections filed by the Commonwealth of Pennsylvania, Department of Human Services (DHS) are OVERRULED, and the application for summary relief filed by Ivy Hill Congregation of Jehovah's Witnesses is DENIED. DHS is hereby ordered to file within 30 days of the date of this order an answer to the Petition for Review in the Nature of a Complaint for Declaratory Relief.


            _____
            P. KEVIN BROBSON, President Judge